UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
                                :

UNITED STATES OF AMERICA,       :

                                :

                                :      **MEMORANDUM & ORDER**
      v.                         :      20-CR-293 (WFK)

                                :

DAVON BROWN, OLUWAGBENGA AGORO,  :
LORENZO BAILEY, QUINCY BATTICE, HANS :
DESTINE, JEAN FREMONT, RICARDO     :
HEPBURN, TRISTON LAWRENCE, MCKOY  :
LIMA, and DERYCK THOMPSON,       :

                                :

                  Defendants.      :
-------------------------------------------------------------X

**WILLIAM F. KUNTZ, II, United States District Judge:**

Before the Court are Defendants' motions to sever, suppress, and grant various forms of relief prior to trial.  For the reasons set forth below, Defendants' motions are DENIED in their entirety.

## BACKGROUND

On August 4, 2021, a grand jury returned a twenty-count Superseding Indictment against

Davon Brown, Oluwagbenga Agoro, Lorenzo Bailey, Quincy Battice, Hans Destine, Jean

Fremont, Ricardo Hepburn, Triston Lawrence, McKoy Lima, Deryck Thompson, and Michael

Williams (collectively, "Defendants").  *See generally* Superseding Indictment, ECF No. 51.   The

Superseding Indictment alleges Defendants are members and associates of the Folk Nation

Gangster Disciples ("GD") gang.  *Id*. at 4-5.  The charged conduct covers several separate

shootings that left at least six victims non-fatally injured.  Gov't Detention Letter ("Det. Letter")

at 1, ECF No. 65.  For these crimes, the Superseding Indictment charges Defendants with

multiple counts of Assault In-Aid-Of Racketeering; Possessing, Brandishing, and Discharging a

Firearm During a Crime of Violence; being a Felon in Possession of a Firearm; Attempted

Murder In-Aid-Of Racketeering; Attempted Assault In-Aid-Of Racketeering; and Conspiracy to Murder Rival Gang Members.  Superseding Indictment at 10-16.

Defendants have made several pretrial motions to suppress evidence, to compel disclosure, and to sever their trials.  Each of those motions is addressed below.

## FACTS

The Superseding Indictment alleges Defendants are members and associates of GD, a violent gang operating throughout Brooklyn and organized into several neighborhood-based subgroups, or "sets," including the No Love City set ("NLC").  Superseding Indictment at 2-5. According to the Government, members and associates of GD employ illicit means to earn money, including trafficking in counterfeit currency, drug trafficking, and fraud.  Det. Letter at 2. Members and associates have also committed alleged acts of violence, including murder and assault, and other crimes, including robbery, extortion, fraud, and obstruction of justice. Superseding Indictment at 2.  The Government claims participation in this criminal activity increased the respect of GD members and could result in promotions to leadership positions.  *Id*.

The Government claims Defendants Agoro, Bailey, Brown, Destine, Fremont, Hepburn, Lawrence, Thompson, and Michael Williams are members of GD, while Defendants Battice and Lima are alleged associates of GD.  Superseding Indictment at 4-5.  The Government further alleges Defendants Bailey, Destine, Fremont, and Thompson are leaders of NLC.  Det. Letter at 2.  Specifically, Defendants Destine and Fremont are alleged members of the set's five-person "Steering Committee"; Bailey is the alleged "Chief of Security" for the set, responsible for policing violations of the gang's internal rules and retaliating against rival gang members; and Thompson is the alleged "Assistant Chief of Security."  *Id*.

## I.      The March 14, 2020 Gold Room Shooting

Shortly after midnight on March 14, 2020, Defendant Brown was allegedly at the Gold Room Restaurant and Lounge, a bar in Prospect Lefferts Garden, Brooklyn. *Id*. That night, a member of a rival gang ("Individual-1") was also at the Gold Room with another individual ("Individual-2"). *Id*. at 3. At some point, Individual-2 got into a dispute with a woman and threw a drink at her, spilling some of the drink onto an individual who appeared to be with Brown ("Individual-3"). *Id*. Individual-3 then began to argue with Individual-1 and Individual-2, at which time Individual-1 began making gang signs, including some intended to disrespect GD. *Id*. The group exited the bar, where the Government claims Brown discharged a gun into the air. *Id*. at 3-4. The Government then alleges Brown walked behind a car and passed the firearm to another individual, who then shot Individual-1 at close range, causing a non-fatal injury. *Id*. at 4.

## II.      The November 7, 2020 Shootings

The Government alleges that on November 7, 2020, Defendants Agoro, Bailey, Battice, Destine, and Thompson engaged in two drive-by shootings in Canarsie, Brooklyn. *Id*. at 10.

Three separate cars were involved in the shootings—an Audi, a Jeep, and a Mercedes—in keeping with what the Government says is GD's practice in other drive-by shootings. *Id*. In this practice, each car and its occupants plays a role in the shootings: one car—in this case, the Jeep—carries the shooters and the guns, while the other two cars—here, the Audi and Mercedes—serve as decoy cars. *Id*. According to the Government, the decoy cars carried unarmed passengers and were intended to slow down the police or draw their attention away from the shooter car. *Id*.

On the day of the alleged shooting, the three cars drove from Flatbush, Brooklyn to rival gang territory in Canarsie, Brooklyn.  *Id*.  At least two occupants of the Jeep then opened fire into a crowd of people, shooting at least eight times before speeding back to Flatbush.  *Id*.  No one was injured in this shooting.  *Id*.  After a short break, the three cars drove back to Canarsie, where at least three occupants of the Jeep fired at least eleven shots into a second crowd of people, non-fatally wounding two bystanders.  *Id*. at 10-11.  The three cars then fled the scene and returned to Flatbush.  *Id*. at 11.

## III.   The November 9, 2020 Shootings

The Government alleges that on the following day, November 8, 2020, Defendant Destine instructed Defendant Agoro to recruit two other individuals for a shooting.  *Id*. at 14. Defendant Agoro allegedly expressed interest in committing the shooting but stated he wanted to be in the shooter car, not the decoy car.  *Id*.

On November 9, 2022, Defendants Agoro, Destine, Hepburn, and Thompson allegedly drove in a three-car convoy to rival gang territory in Prospect Park South, Brooklyn.  *Id*. at 15. The Government claims Defendant Hepburn drove the shooter car—a stolen BMW—with Defendants Agoro and Thompson as passengers, while Defendants Destine and Lima drove the decoy cars.  *Id*. at 14.  One of the decoy cars—a white Acura—was a rental car equipped with a GPS tacker rented by Defendant Lima.  *Id*.

After twice circling a group of men, the cars stopped.  *Id*. at 15.  Agoro and Thompson allegedly exited the shooter car and opened fire across the street, firing several shots before fleeing to Flatbush.  *Id*.

Later on November 9, 2020, Defendants Agoro, Fremont, Hepburn, Lima, and Thompson allegedly participated in another drive-by shooting.  *Id*.  Defendants drove in a two-car convoy,

with the BMW again serving as the shooter car and the Acura acting as the decoy car.  The

Government alleges Defendant Hepburn allegedly drove the BMW with Defendant Agoro,

Defendant Thompson, and another individual as passengers, while Defendant Lima drove the

Acura with Defendant Fremont as a passenger.  *Id*.

The two cars drove to Brownsville, Brooklyn, where one or more occupants of the BMW

began shooting into a crowd, striking one woman in the shoulder and grazing her back.  *Id*. at 16.

The two cars then fled to Flatbush.  *Id*.

## IV.    Other Alleged Crimes

The Government also alleged that on July 23, 2020, Defendant Michael Williams, with

others, shot into a crowd intending to shoot rival gang members, and that on August 2, 2020,

Defendant Lawrence, with others, participated in a shooting at the corner of Hawthorne Street

and Nostrand Avenue in Brooklyn.  *Id*. at 5-10.  On June 15, 2022, Defendant Lawrence pleaded

guilty to Count Nine of the Superseding Indictment, *see* June 15, 2022 Minute Entry, and on July

7, 2022, Defendant Michael Williams pleaded guilty to Count Five of the Superseding

Indictment.  *See* July 7, 2022 Minute Entry.

## V.    Investigation into November 2020 Shootings

Following the November 7, 2020 shootings, the New York City Police Department

("NYPD") conducted a "video canvass" of the area, identifying surveillance cameras near the

scene of the crime.  Gov't Resp. at 4, ECF No. 234.  The video canvass revealed footage of the

Jeep, Mercedes, and Audi and of the occupants of the Jeep committing a shooting.  *Id*. at 5.

Additional surveillance footage revealed the Jeep's license plate number, which, in turn, allowed

the NYPD to locate the company from which the Jeep was rented.  *Id*.  On November 9, 2020,

NYPD Detectives Ahwal and Huertas contacted the owner of the company, Aharon Itzkowitz, who, according to the Government, was "entirely cooperative with the investigation." *Id*. at 5-6. Itzkowitz provided access to his surveillance video system and to the data generated by the GPS tracker he had installed in the Jeep. *Id*. at 6. Itzkowitz then signed a consent-to-search form for the Jeep. *Id*.; Consent-to-Search Form, Ex. 4, ECF No. 234-4. He also provided the rental paperwork for the Jeep, which showed the car had been rented by Defendants Fremont and Battice using fake driver's licenses. Gov't Resp. at 7. The video canvass continued throughout the investigation, including after the collection of the Jeep's GPS data. *Id*. At some point, however, officers began using the GPS data to identify additional sources of surveillance video. *Id*.

A similar video canvass occurred after the November 9, 2020 shootings. *Id*. During that investigation, the NYPD also tracked the Acura back to Itzkowitz's rental car company. *Id*. at 7-8. According to the Government, Itzkowitz also voluntarily provided the NYPD with the GPS data for the Acura. *Id*. at 8.

## DISCUSSION

### I.    Motions to Suppress

On a motion to suppress, the defendant bears the initial burden of establishing he was subjected to a warrantless search or seizure. *United States v. Herron*, 18 F. Supp. 3d 214, 221 (E.D.N.Y. 2014) (Garaufis, J.) (citing *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980)). The burden then shifts to the Government "to demonstrate by a preponderance of the evidence that the search or seizure did not violate the Fourth Amendment." *Id*. (citations omitted).

A.      **Suppression of GPS Data for Vehicles Used in the November 2020 Shootings**

Defendants Bailey, Battice, Fremont, and Thompson move to suppress evidence relating to GPS data for the Jeep used in the two November 7, 2020 shootings.  Bailey Mot., ECF No. 218; Battice Mem. at 2-17, ECF No. 196-1; Fremont Mot., ECF No. 207; Thompson Mot., ECF No. 208.  Defendant Lima moves to suppress evidence relating to GPS data for the Acura used in the second November 9, 2020 shooting.  Lima Mem. at 10-15, ECF No. 199-1.

1.      *Standing*

The Government first argues Defendants lack standing to suppress the rental car GPS data because (1) they have not submitted any affidavits based on personal knowledge that demonstrate a basis for a Fourth Amendment interest in the GPS data, and (2) they lack a privacy interest in the data.  Gov't Mem. at 8-10.

Courts often analyze the question of whether an individual has a cognizable Fourth Amendment interest as one of "standing."  *Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).  However, Fourth Amendment "standing" is "not distinct from the merits and 'is more properly subsumed under substantive Fourth Amendment doctrine.'"  *Id*. (quoting *Rakas v. Illinois*, 439 U.S. 128, 139 (1978)).  Therefore, the Court need not address whether Defendants lack "standing" before addressing the merits of the Fourth Amendment claims.  *Id*.

As an initial matter, however, the Court turns to the Government's claim that Defendants lack standing because they failed to submit the required affidavits.  "As the party moving to suppress, defendant bears the burden of establishing his standing," which in the Fourth Amendment context, requires the defendant to prove the Government's conduct violated his legitimate expectation of privacy.  *United States v. Loera*, 333 F. Supp. 3d 172, 179 (E.D.N.Y. 2018) (Cogan, J.), *aff'd sub nom. United States v. Guzman Loera*, 24 F.4th 144 (2d Cir. 2022)

7

(citing *United States v. Osorio*, 949 F.2d 38, 40 (2d Cir. 1991) and *United States v. Montoya-Escheverria*, 892 F. Supp. 104, 106 (S.D.N.Y. 1995) (Kaplan, J.)).  This burden "is met only by sworn evidence, in the form of affidavit or testimony, from the defendant or someone with personal knowledge." *Id*.  An "unsworn assertion of the Government's representations does not meet this burden." *Id*.

Here, on July 8, 2022, Defendants Battice and Lima filed declarations stating they had rented the Jeep and Acura, respectively.  Lima Decl., ECF No. 237-3; Battice Decl., Ex. A, ECF No. 241.  On August 22, 2022, Defendant Fremont filed a similar declaration with respect to the Jeep.  Fremont Decl., ECF No. 265-2.  These Defendants have therefore filed the prerequisite sworn statements necessary to establish they had a Fourth Amendment interest in the data they seek to suppress.  However, neither Defendant Thompson nor Defendant Bailey has provided the required affidavit and no third party has provided sworn evidence showing personal knowledge of their expectation of privacy with respect to GPS data.  Accordingly, to the extent Defendants Thompson and Bailey joined in the motions to suppress GPS data, *see* ECF Nos. 208 and 218, their applications are denied.  *See United States v. Shuai Sun*, No. 18-CR-905 (LTS), 2020 WL 529274, at *2 (S.D.N.Y. Feb. 3, 2020) (Swain, J.) (holding defendant lacked standing to challenge the search of a vehicle because he did not submit an affidavit or sworn declaration asserting he had rights in the vehicle's contents that were violated); *see also United States v. Almaleh*, No. 17-CR-25 (ER), 2022 WL 602069, at *13 (S.D.N.Y. Feb. 28, 2022) (Ramos, J.) ("The defendant must submit sworn evidence, in the form of an affidavit or testimony, from the defendant or someone with personal knowledge, demonstrating sufficient facts to show that he had a legally cognizable privacy interest in the searched premises at the time of the search.") (internal quotation marks and citations omitted).

2.      *Privacy Interest*

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  "When an individual seeks to preserve something as private, and his expectation of privacy is one that society is prepared to recognize as reasonable, . . . official intrusion into that private sphere generally qualifies as a search and requires a warrant supported by probable cause." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (internal quotation marks and citations omitted).  Put another way, a search under the Fourth Amendment occurs when "the government violates a subjective expectation of privacy that society recognizes as reasonable."  *Loera*, 333 F. Supp. 3d at 179 (citing *Kyllo v. United States*, 533 U.S. 27, 33 (2001)).

In determining which expectations of privacy are entitled to protection, courts are "informed by historical understandings of what was deemed an unreasonable search and seizure when the Fourth Amendment was adopted."  *Carpenter*, 138 S. Ct. at 2213–14 (internal quotations and alterations omitted).  Specifically, the Court is guided by the understanding that the Fourth Amendment "seeks to secure 'the privacies of life' against 'arbitrary power'" and "that a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance.'"  *Id*. at 2214 (quoting *Boyd v. United States,* 116 U.S. 616, 630 (1886) and *United States v. Di Re,* 332 U.S. 581, 595 (1948)).

A reasonable expectation of privacy may extend to an individual's "physical location and movements."  *See Carpenter*, 138 S. Ct. at 2215.  For example, cell-site records, "[a]s with GPS information," "provide[] an intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'"  *Id*. at 2217 (citing *United States v. Jones,* 565 U.S. 400, 415 (2012)

9

(opinion of Sotomayor, J.)).  "These location records 'hold for many Americans the privacies of life.'"  *Id*. (quoting *Riley v. California,* 573 U.S. 373, 403 (2014)) (internal quotation marks omitted).

Defendants claim they had a reasonable expectation of privacy in the historical location data associated with the rental cars throughout the rental period.  Battice Mem. at 5-10, ECF No. 196-1; Lima Mem. at 10-14, ECF No. 199-1.  Accordingly, Defendants argue the police needed either their consent or a warrant to search that data.  Battice Mem. at 10; Lima Mem. at 11.  The Government, on the other hand, contends Defendants lack privacy interests in the GPS data at issue because (1) it was owned by a third party and the Supreme Court and appellate courts have not extended an exception to the rule that individuals do not have privacy rights in records held by third parties to vehicle GPS data; and (2) while Defendants Battice and Fremont were the renters of the Jeep, they rented the car fraudulently using fake driver's licenses with stolen driver's license numbers and, in the case of Battice, a fake name.  According to the Government, cases have widely held defendants have no privacy interest in property obtained by fraud.

As an initial matter, the third-party doctrine applies to the GPS data at issue.  The Supreme Court "has drawn a line between what a person keeps to himself and what he shares with others," *Carpenter*, 138 S. Ct. at 2216, and held "a person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  *Smith v. Maryland*, 442 U.S. 735, 743–744 (1979).  The Government is therefore "typically free to obtain such information from the recipient without triggering Fourth Amendment protections."  *Carpenter*, 138 S. Ct. at 2216.  This "third-party doctrine" forecloses claims to expectations of privacy when the defendant "takes the risk, in revealing his affairs to another, that the information will be conveyed by that person to the Government."  *United States v. Miller*, 425 U.S. 435, 443 (1976).

10

In *Miller*, for example, the Supreme Court rejected a Fourth Amendment challenge to a government subpoena for copies of checks, deposit slips, and other bank records because the defendant lacked an expectation of privacy in the documents.  425 U.S. at 445.  The Court held the records were not "private papers," the defendant had "neither ownership or possession" of them, and they constituted "business records of the banks."  *Id.* at 440.  The bank records were "not confidential communications but negotiable instruments to be used in commercial transactions" and "contain[ed] only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business."  *Id.* at 442.  The Court concluded the defendant, in disclosing the records to a third party, assumed the risk the information would be passed to the Government.  *Id.* at 443.  The Court thus rejected the claim of an expectation of privacy.

Similarly, in *Smith*, the Supreme Court held that the use of a pen register to collect phone numbers dialed from a telephone did not constitute a search for the purposes of the Fourth Amendment.  442 U.S. at 744.  In reaching this conclusion, the Court determined it is "doubt[ful] that people in general entertain any actual expectation of privacy in the numbers they dial" because "[a]ll telephone users realize that they must 'convey' phone numbers to the telephone company" so the company can complete their calls and bill properly.  *Id.* at 742.  The Court also based its holding on the finding that in voluntarily turning phone numbers over to a third party, the user took the risk that the information would be turned over to the Government by the phone company.  *Id.* at 742-45.

In *Carpenter*, however, the Supreme Court rejected a bright-line application of the third-party doctrine, explaining it "partly stems from the notion that an individual has a reduced expectation of privacy in information knowingly shared with another.  But the fact of diminished

privacy interests does not mean that the Fourth Amendment falls out of the picture entirely."
138 S. Ct. at 2219.  In fact, even where information has been disclosed to a third party, courts
must "consider[] the nature of the particular documents sought to determine whether there is a
legitimate expectation of privacy concerning their contents."  *Id*. (internal quotation marks
omitted) (citing *Miller,* 425 U.S. at 442).  The Court emphasized, however, that it would be a
"rare case" where the suspect had a legitimate privacy interest in records held by a third party,
describing its decision as a "narrow one."  *Id*. at 2220, 2222.

Like the information at issue in *Miller* and *Smith*, rental car GPS data is voluntarily
disclosed to third parties—namely, rental car companies.  Accordingly, this data carries a
"reduced expectation of privacy."  *Id*. at 2219.  With that in mind, the Court considers whether
the nature of the documents sought—here, rental car GPS data—conveys to Defendants a
legitimate expectation of privacy concerning their contents.

Rental car location data shares many traits with the various types of information the
Supreme Court has analyzed in the Fourth Amendment context.  For example, in *Carpenter*, the
Court reasoned that cell-site location information "partakes of many of the qualities of . . . GPS
monitoring" and is "detailed, encyclopedic, and effortlessly compiled" "[m]uch like GPS
tracking of a vehicle."  138 S. Ct. at 2216.  The Court explained these forms of location data
provide an "intimate window into a person's life."  *Id*. at 2217.  However, the Court ultimately
declined to extend the third-party doctrine to cell-site location information because "an
individual maintains a legitimate expectation of privacy in the record of his physical movements
as captured through" such information.  *Id*. at 2217.  The Court highlighted that cell phone
location information raises greater privacy concerns than GPS monitoring of a vehicle, noting
"[w]hile individuals regularly leave their vehicles, they compulsively carry cell phones with

12

them all the time." *Id*. at 2218.  Moreover, the Court raised a particular concern about cell phone location tracking "run[ning] against everyone" because phone location information is continually logged for all cell phones.  *Id*.

The Supreme Court has also addressed electronic tracking more specifically in the context of vehicles.  In *United States v. Knotts*, law enforcement officers had placed a radio transmitter inside a container of chemicals to track a suspected manufacturer of illicit drugs.  460 U.S. 276, 277 (1983).  Officers tracked the container as it was transported in vehicles.  *Id*. According to the Court, this type of surveillance, where the target could be tracked with the naked eye, "amounted principally to the following of an automobile on public streets and highways." *Id*. at 281.  As a result, the Court held "[a] person travelling in an automobile on public thoroughfares has no reasonable expectation of privacy in his movements from one place to another." *Id*.

The following year, in *United States v. Karo*, the Court affirmed *Knotts* in a case in which the Government used a radio transmitter to track vehicles for over four months, though the Court concluded the monitoring of the transmitter inside a private residence constituted a violation of the Fourth Amendment.  468 U.S. 705, 713–14 (1984).

Finally, in *Jones*, the Supreme Court held that the Government's installation of a GPS tracking device on a defendant's wife's vehicle, "and its use of that device to monitor the vehicle's movements constitute[d] a 'search.'" *Jones*, 565 U.S. at 404.  In so concluding, the Court explained the significance of property rights in search-and-seizure analysis, noting the vehicle was an "effect" under the Fourth Amendment belonging to the defendant's wife and that "[t]he Government physically occupied private property for the purpose of obtaining information." *Id*.  Several years later, in analyzing Fourth Amendment property interests, the

13

Court explained it is "well established that a person need not always have a recognized common-law property interest in the place searched to be able to claim a reasonable expectation of privacy in it," but the "legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Byrd*, 138 S. Ct. at 1527 (quoting *Rakas*, 439 U.S. at 144).

Notably, in *Jones*, two concurrences, joined by a total of five justices, argued the use of the GPS tracking device on the defendant's wife's vehicle may have infringed on the defendant's reasonable expectation of privacy in the vehicle's movements. *See id*. at 413-18 (Sotomayor, J. concurring); *id*. at 418-31 (Alito, J., concurring, joined by Ginsburg, Breyer, and Kagan, JJ.). Although not addressing the issue directly, Justice Sotomayor stated "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties," in part because "[t]his approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks." *Id.* at 417.

Despite the similarities between cell-site location data and GPS location data, rental car GPS location information is distinguishable from cell-site location data for several reasons.

First, on any given day, significantly fewer Americans use rental cars than cell phones. *See Carpenter*, 138 S. Ct. at 2218 (noting cell-site location data "continually logged" the location of "all of the 400 million devices in the United States"). As a result, the *Carpenter* Court's concern that location tracking "runs against everyone" is significantly diminished in the context of rental car location tracking.

14

Second, rental cars are not so intimately intertwined with the daily life of the user as to give rise to the "near perfect surveillance" rebuffed in *Carpenter.*   138 S. Ct. at 2218.  Unlike with cell phones, which are "almost a feature of human anatomy" and "track[] nearly exactly the movements" of their owners, individuals "regularly leave their vehicles."  *Id*.  Indeed, the Supreme Court recognized a "cell phone faithfully follows its owner beyond public thoroughfares," to which rental cars are typically limited, "and into private residences, doctor's offices, political headquarters, and other potentially revealing locales."  *Id*.

Third, people renting cars generally understand rental car companies may use location data to locate late, lost, or stolen cars, to offer roadside assistance, or to protect their property in the event of an emergency.  *See* Itzkowitz Decl. ¶ 3, ECF No. 234-17.  Unlike in a leased or owned car, the GPS data in a rental car is not used for the benefit of the renter, who has neither control nor access to it; rather, it is for the benefit of the company.  Few people expect otherwise.  In fact, language advising renters of GPS tracking is a common feature of many car rental agreements.  *See, e.g.*, Avis Rental Agreement, ECF No. 263, Ex. A.  Thus, as with the telephone user providing dialed phone numbers to telephone companies, it is "doubt[ful] that people in general entertain any actual expectation of privacy in" the location of their rental cars because that information has become a common component of the operation of rental car companies.  *See Smith*, 442 U.S. at 742.

Fourth, Defendants have no property interest in the records in question.  The Court in *Miller* found the defendant lacked an expectation of privacy in bank records because they were "business records of the banks," not the "private papers" of the defendant, who had "neither ownership or possession" of them.  The bank records were "not confidential communications"; rather, they were "to be used in commercial transactions" and "contain[ed] only information

voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Miller*, 425 U.S. at 442. Similarly, rental car location data is voluntarily provided by the user for commercial purposes—namely, locating cars. Such information does not constitute a "confidential communication" and is disclosed to rental car company employees "in the ordinary course of business." *Id*.

Finally, people typically rent cars for short periods of time, mitigating the risk of long-term, unbroken surveillance. In *Carpenter*, the Supreme Court held that accessing historical cell phone records constituted a search under the Fourth Amendment because cell phone records "provide a comprehensive chronicle of the user's past movements." 138 S. Ct. at 2211. The Court expressed concern about using cell-site location data for the tracking of individuals "not for a short period but for years and years," which could result in a defendant having "effectively been tailed every moment of every day for five years." *Id*. at 2218-19. Short term car rentals provide no such chronicle. Rather than permitting law enforcement to "travel back in time to retrace a person's whereabouts, subject only to the retention polices of the wireless carriers, which [as of 2018] maintain[ed] records for up to five years," the location records in a rental car only reveal a renter's whereabout during the rental period. *Id*. at 2218.

In the present case, Defendants rented the Jeep from Itzkowitz for a short, six-day period (though it was returned late).[1] *See* Jeep Rental Agreement, ECF No. 234-7; Itzkowitz Decl. ¶ 5.

---

[1] Defendant Battice notes the Government obtained the Jeep's location data from October 9, 2020 through November 10, 2020. Silverman Decl. ¶ 8, ECF No. 198. However, Defendants have no legal claim to the rental car or its data outside of the rental period, particularly when the renters used fake driver's licenses to rent the vehicles. *See Byrd v. United States*, 138 S. Ct. 1518, 1529 (2018) (finding a reasonable expectation of privacy in a rental car when an individual has "lawful possession of" the car); *see also United States v. Lyle*, 919 F.3d 716, 729 (2d Cir. 2019) (finding no reasonable expectation of privacy where use of a rental car is unlawful and "a rental company with knowledge of the relevant facts certainly would not have given him permission to drive its car nor allowed a renter to let him do so"); *see* Itzkowitz Decl. ¶ 2. Accordingly, the six-day rental period is the relevant time period in assessing the instant Fourth Amendment claims.

In contrast to *Carpenter*, where the "[m]aping [of] a cell phone's location over the course of 127 days provide[d] an all-encompassing record of the holder's whereabouts," 138 S. Ct. at 2217, the six days during which the Jeep was rented cannot possibly offer the same "intimate window into a person's life" supporting an expectation of privacy.  Even with respect to *Carpenter*'s narrower holding—"accessing seven days of [cell-site location information] constitutes a Fourth Amendment search"—the Court finds the shorter time period, coupled with the differences between cell-site location data and rental car GPS data, mitigates Fourth Amendment concerns. *Id*.

With respect to the Acura rented by Defendant Lima, the Court is mindful that longer term GPS monitoring of a vehicle may constitute a search.  *Id*. at 2220 ("[W]hen confronted with more pervasive tracking, five Justices [of the Supreme Court] agreed that longer term GPS monitoring of even a vehicle traveling on public streets constitutes a search.") (citing *Jones,* 565 U.S. at 430).  Defendant Lima rented the Acura from on or about July 2020 to on or about November 18, 2020—roughly four months.  Warrant Affidavit ¶ 16, ECF No. 200-1.  Although this rental period is significantly longer than that of the Jeep, it is still substantially less invasive than the five-year tracking concern expressed in *Carpenter*.  Accordingly, the length of the Acura rental period is insufficient to overcome the other factors distinguishing rental car GPS data from cell-site location information.  The third-party doctrine thus also applies to the GPS data in the Acura.

In light of the foregoing, the Court concludes the third-party doctrine applies to the rental car GPS location data in this case.  Defendants therefore did not have an expectation of privacy in the data, and the Government's use of these records did not constitute a search under the Fourth Amendment.

3.      *Property Interest*

Defendant Battice claims that in addition to a privacy interest, he also has a property interest in the rental car GPS location data.  Battice Mem. at 12-13. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. CONST. amend. IV.  Defendant Battice argues he has a property interest in "his papers (his location data), and his effects (the rental car)." Battice Mem. at 12.  The Court disagrees.

As an initial matter, whether Defendant Battice had a property interest in the physical rental car is not relevant to the Fourth Amendment analysis in this case because the challenged search concerns the historical location data of the rental car, not the rental car itself.  Defendant Battice has not presented an argument that the search of the physical rental car violated his Fourth Amendment rights.

Secondly, in support of his argument that GPS location data are "papers" in which he has an interest under the Fourth Amendment, Defendant Battice cites to Justice Gorsuch's dissent in *Carpenter*.  Justice Gorsuch wrote in support of a "traditional approach" to Fourth Amendment analysis, requiring courts to consider the source of a person's legal rights to the houses, papers, or effects at issue and reducing the role of the third-party doctrine.  138 S. Ct. at 2268 (Gorsuch, J., dissenting).  The majority did not adopt this approach, but even if it had, Defendant Battice has not articulated any legitimate, non-conclusory source of his claimed property right in the rental car GPS location data.

Defendant Battice's comparison to *Jones* is similarly unpersuasive.  In *Jones*, the Court determined the installation of a GPS tracking device on the defendant's wife's car constituted a search for Fourth Amendment purposes.  *Jones*, 565 U.S. at 404.  However, *Jones* limited its

holding to physical intrusions, where "[t]he Government physically occupied private property for the purpose of obtaining information." *Id*. There was no such "physical occupation" of the GPS data at issue in the present case.

Accordingly, Defendant Battice did not have a Fourth Amendment property interest in the rental car GPS data, and his motion to suppress on that basis is denied.

### 4.    *Rental Car Consent*

Even if Defendants had succeeded in establishing the Government's review of the GPS location data constituted a search, the motions to suppress must be denied because the owner of the data—the car rental company—consented to its search.

Warrantless searches are "per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967).  The consent exception permits warrantless searches where law enforcement officers receive valid consent to perform the search. *See generally Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973).  "The government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary. . . .  Voluntariness is a question of fact determined by 'a totality of the circumstances.'" *United States v. Isiofia*, 370 F.3d 226, 230-31 (2d Cir. 2004) (citation omitted) (quoting *Schneckloth*, 412 U.S. at 227).  "The ultimate question presented is whether the officer had a reasonable basis for believing that there had been consent to the search." *Id.* (internal quotation marks, citation, and alteration omitted).  Thus, courts "must apply an objective standard . . . [,] asking what would the typical reasonable person have understood by the exchange." *United States v. Bartee*, No. 13-CR-365 (RJS), 2013 WL 6164339, at *9 (S.D.N.Y. Nov. 12, 2013) (Sullivan, J.) (internal quotation marks and alterations omitted).  As part of this inquiry, courts consider:

> (1) the consenting party's knowledge of his right to refuse consent; (2) whether the police used subtly coercive police questioning to elicit the consent; (3) the possibly vulnerable state of the consenting party; (4) the number of police officers on the scene; (5) whether the consenting party was under arrest and whether the arrest was effected through forcible entry, use of force, or display of weaponry.

*Mangino v. Inc. Vill. of Patchogue*, 739 F. Supp. 2d 205, 245 (E.D.N.Y. 2010) (Bianco, J.)

(citing *Schneckloth*, 412 U.S. at 227–29).

According to Defendant Battice, the Jeep's GPS data was not obtained by consent because: (1) the police never documented they received the consent of the rental car company's owner to search the GPS; and (2) the owner's statements to the Defense's investigator reveal he gave his permission to view the GPS data only after the police returned a second time claiming to have a subpoena.  Battice Mem. at 2; Silverman Decl. ¶ 6.  Defendant Lima argues consent was lacking because the Government has not produced a verifying consent form and only obtained a search warrant many months after the initial search.  Lima Mem. at 10, 15.  The Government states law enforcement officers obtained permission from the rental car company to search the cars' GPS data, rendering any claim of an invalid search meritless.  Warrant Affidavit ¶ 17; Gov't Mem. at 20.

Here, as owner of the car rental company, Mr. Itzkowitz—not Defendants—had authority to consent to a search of the cars' GPS data.  The data was his to give because he had installed the GPS systems in his company's cars in order to track late, lost, or stolen vehicles, and he had access to and the ability to download the data.  Itzkowitz Decl. ¶ 3.  Defendants, on the hand, had neither a privacy nor property interest in the data, so their consent was not needed to access it.

Moreover, the totality of the circumstances indicates Mr. Itzkowitz voluntarily consented to the search of the GPS data of both the Jeep and the Acura.  Although the consent to search the GPS data was not documented, Mr. Itzkowitz submitted a sworn declaration stating he does not

recall giving law enforcement officers GPS records for the Jeep but that if he did so, he would have given them voluntarily.  Itzkowitz Decl. ¶ 7.  Mr. Itzkowitz did not explicitly reference the Acura in his declaration, but he demonstrated his consent to search the Acura's location data by stating he "always agreed to help law enforcement when asked, including by providing GPS information for [his] cars."  Itzkowitz Decl. ¶ 8.  During the present investigation, Mr. Itzkowitz agreed to speak with the officers, as he always has, and stated that when he provides GPS data to law enforcement officers, "it is usually because [he] offered it, since law enforcement usually does not know to ask [him] for GPS records."  *Id*. Moreover, the detectives who interviewed Mr. Itzkowitz corroborated his account.  Specifically, the detectives described Mr. Itzkowitz as "extremely friendly and cooperative" and noted he "voluntarily provided" the GPS data in question.  Huertas Decl. ¶¶ 6-7; Ahwal Decl. ¶¶ 7-8.

The factors listed in *Mangino* further support a finding that Mr. Itzkowitz's consent to search the GPS data in this case was valid and voluntary.  There is no indication Mr. Itzkowitz was coerced by law enforcement, in a vulnerable state, or under arrest when he consented to the search.  To the contrary, he was extremely cooperative with the detectives and claims he has never been threatened with a subpoena for GPS records.  Itzkowitz Decl. ¶¶ 6, 8; Det. Ahwal Decl. ¶ 7.  Further, only two officers spoke with Mr. Itzkowitz and in the comfort of his own place of business when he consented to the search.  Finally, there is no indication Mr. Itzkowitz was not aware of his right to refuse the search, especially given his experience working with law enforcement in the past.  Itzkowitz Decl. ¶ 8.  Mr. Itzkowitz's consent was therefore voluntary.

Accordingly, Defendants' motions to suppress the GPS data and its fruit on the basis of the voluntariness of the consent are denied.  Defendants' motions to compel the Government to identify the fruits of its GPS search are therefore also denied as moot.

**B.      Motion to Suppress Various Search Warrants**

Defendants Battice, Bailey, and Lima challenge certain search warrants on the bases that (1) the Government lacked probable cause, (2) the warrants were overbroad, insufficiently particular, or lacking a temporal limitation, and (3) the Government failed to timely review the warrant returns.  These arguments fail for the reasons set forth below.

*1.      Probable Cause*

"[T]he Fourth Amendment provides that 'a warrant may not be issued unless probable cause is properly established and the scope of the authorized search is set out with particularity.'" *United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013) (quoting *Kentucky v. King*, 563 U.S. 452, 459 (2011)).  The probable cause requirement is met "where the totality of circumstances indicates a 'fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Clark*, 638 F.3d 89, 94 (2d Cir. 2011) (citing *Walczyk v. Rio*, 496 F.3d 139, 156 (2d Cir. 2007)).  "This required nexus between the items sought and the 'particular place' to be searched protects against the issuance of general warrants."  *Id*. (citing *Stanford v. State of Texas,* 379 U.S. 476, 481 (1965).  Ultimately, however, "[a]ffidavits in the 'so lacking in indicia of probable cause' category are primarily those that are 'bare bones, *i.e.*, totally devoid of factual circumstances to support conclusory allegations.'"  *United States v. Shafer*, No. 21-1334-CR, 2022 WL 868901, at *2 (2d Cir. Mar. 24, 2022) (summary order) (quoting *Clark*, 638 F.3d at 103).

 "[T]he duty of a court reviewing the validity of a search warrant is 'simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed.'"  *United States v. Rosa*, 11 F.3d 315, 326 (2d Cir. 1993) (quoting *Illinois v. Gates,* 462 U.S. 213, 238–39 (1983) (internal quotation marks omitted)).  Indeed, a "magistrate's determination of probable

cause should be paid great deference by reviewing courts." *United States v. Nelson*, 828 F. App'x. 804, 806 (2d Cir. 2020) (summary order) (quoting *Gates*, 462 U.S. at 236) (internal quotation marks omitted).

In the present case, Defendant Bailey challenges warrants to search and obtain records associated with his social media and iCloud accounts for lack of probable cause. Bailey Mem. at 3, ECF No. 202-3. Specifically, he claims the warrants lacked probable cause to believe: (1) he communicated his planning or participation in the alleged crimes with his co-Defendants; (2) he was a member of GD; (3) he committed the subject offenses; or (4) he participated in the November 7, 2020 shootings. Bailey Mem. at 3-4. However, the affidavits submitted in support of the challenged warrants provide more than a fair probability that contraband or evidence of a crime would be found on Defendant Bailey's social media and iCloud accounts. Here, probable cause arises from Defendant Bailey's use of social media to demonstrate his associations with GD and text message communications between his co-Defendants.

First, Defendant Bailey is alleged to be a member of GD and to have engaged in the November 7, 2020 shootings, and the warrant affidavits contain dozens of pages explaining how Defendants used social media to demonstrate their membership in the enterprise. Bailey Mem., Exs. A and B, ECF Nos. 203-1, 203-2. The evidence cited in the affidavits includes profile pictures showing Defendants allegedly using gang signs and GD symbols, photographs revealing associations with other alleged members of GD, references to GD in posts and usernames, and photographs of what the Government claims are Defendants' clothes during the alleged crimes. *Id.* In fact, according to the affidavits, the account Defendant Bailey now seeks to suppress posted what the affiant stated were GD-related symbols, photos with other members and associates of GD, and photos of Defendant Bailey making GD gang signs. *Id.* ¶¶ 20-24.

Second, the iCloud warrant affidavit states law enforcement officers had found relevant evidence on the phones of other GD members.  Bailey Mem., Ex. B ¶ 20.  Among the relevant evidence was a text exchange between Defendants Destine and Agoro discussing the alleged shootings.  *Id*. ¶¶ 88-89.  Shootings involving multiple vehicles driving in convoys require substantial coordination, which, based on the conversations between Defendant Bailey's co-Defendants, appears to have been achieved via Defendants' cell phones.  These conversations suggest there was evidence relevant to the alleged crimes located on Defendants' phones sufficient to establish probable cause.  The Court therefore denies Defendants motions to suppress on this basis.

### 2.    *Particularity and Breadth of the Warrants*

"To satisfy the Fourth Amendment's particularity requirement, a warrant must meet three criteria: (1) it must identify the specific offense for which the police have established probable cause; (2) it must describe the place to be searched; and (3) it must specify the items to be seized by their relation to designated crimes."  *United States v. Purcell*, 967 F.3d 159, 178 (2d Cir. 2020) (internal quotations omitted).  "[A] warrant is overbroad if its 'description of the objects to be seized . . . is broader than can be justified by the probable cause upon which the warrant is based.'"  *United States v. Lustyik*, 57 F. Supp. 3d 213, 228 (S.D.N.Y. 2014) (Briccetti, J.) (quoting *United States v. Galpin*, 720 F.3d 436, 446 (2d Cir. 2013)).  The particularity inquiry, on the other hand, requires the Court to determine "whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers."  *United States v. Hernandez*, No. 09-CR-625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) (Baer, J.).  The Second Circuit has found that "broadly worded categories of items

available for seizure" do not necessarily render a warrant deficient.  *United States v. Riley*, 906 F.2d 841, 844 (2d Cir. 1990).

Defendant Bailey challenges the particularity of certain warrants because he claims they lacked an appropriate temporal limitation.  Bailey Mem. at 19-20.  Specifically, he argues the warrant's demand for information dating from September 27, 2013 is insufficiently particularized given that his alleged crime occurred on one day in November 2020.

"No controlling authority requires a specific time frame" to establish particularity, though "[s]everal courts in this Circuit have recognized the constitutional questions that are raised by the lack of a specific date range in a warrant."  *United States v. Levy*, No. S5 11 CR. 62 (PAC), 2013 WL 664712, at *11, n.7 (S.D.N.Y. Feb. 25, 2013) (Crotty, J.), *aff'd*, 803 F.3d 120 (2d Cir. 2015). "While a temporal limitation is *one indicia* of particularity, courts in this Circuit have recognized that the complexity and duration of the alleged criminal activities may render a time frame less significant than in a case that required a search for a small set of discrete items related to one or only a few dates."  *United States v. Nejad*, 436 F. Supp. 3d 707, 729 (S.D.N.Y. 2020) (Nathan, J.) (internal citations, alterations, and quotations marks omitted) (emphasis in original).

Although the alleged crimes in this case occurred over a few days in 2020, they are complex and the conduct underlying the charges relates to racketeering, racketeering conspiracy, and violence in-aid-of racketeering, which occurred over longer periods of time.  Such crimes require the Government to prove "an enterprise and a pattern of racketeering activity," which often requires evidence stretching years into the past.  *United States v. DiNome*, 954 F.2d 839, 843 (2d Cir. 1992).  Here, the period beginning September 27, 2013 is relevant to the alleged enterprise because a 2016 indictment involved a conspiracy within NLC alleged to have existed since September 27, 2013 and which included some of Defendant Bailey's co-Defendants.

Affidavit ¶ 13, ECF No. 203-1.  Accordingly, the warrant's broad time frame does not render the warrant overbroad.  *See United States v. Cohan*, 628 F. Supp. 2d 355, 367 (E.D.N.Y. 2009) (Block, J.) (citing *United States v. Gotti*, 42 F. Supp. 2d 252, 274 (S.D.N.Y.1999) (Parker, J.) ("Nor, in light of the circumstances and the fact that JAG Brokerage was believed to have served only as an instrumentality of racketeering, is the warrant defective because it contained no time limitations.").

Defendants Battice, Bailey, and Lima next challenge certain warrants that "permit law enforcement to seize categories of information that are not reasonabl[y] likely to yield evidence of a crime," including:

- "All records of the account's usage of the 'Like' feature."

- "All information about the Facebook pages that the account is or was a 'fan' of."

- "All records of Facebook searches performed by the account."

- "The types of service utilized by the user."

Battice Mem. at 23-24; Bailey Mem. at 18-19; Lima Mem. at 16-17.

As an initial matter, the "types of service utilized by the user" is not a category of content protected by the Fourth Amendment and can be sought by subpoena instead of a warrant.  *See* 18 U.S.C. § 2703(c)(2)(D).  Accordingly, this category is not overbroad or lacking in particularity such that its results require suppression.

Moreover, as noted, in the RICO context, the Government must prove the existence of the enterprise and a pattern of racketeering activity.  A defendant's Facebook "likes," the pages of which he is a "fan," and his searches on the site are relevant evidence for establishing the alleged racketeering enterprise.  Such evidence relates to Defendants' affiliations, interest in

gang-related material, and possible participation and membership in the enterprise.  These categories are also limited by the two-stage search established in the warrants, pursuant to which law enforcement collects a broad array of information from the provider but identifies and seizes a more narrowly tailored subset of the information related to the subject offenses.  *See* Attachments B(I) and B(II), ECF Nos. 200-1, 200-3, 200-4.  This practice mitigates the instant concerns regarding overbreadth and lack of particularity.  *See*, *e.g.*, *United States v. Scully*, 108 F. Supp. 3d 59, 91-92 (E.D.N.Y. 2015) (finding search warrants for electronically stored information neither overly broad nor insufficiently particular in part because the warrant contained a two-step tailoring process).  It also facilitates searches in situations where the provider—*e.g.*, Facebook—does not provide law enforcement with filtered information pertaining only to specific alleged crimes.  *See* Gov't Mem. at 42.

In light of the nature of this evidence, the RICO context, and the required deference to the magistrate judge's determination of probable cause, the Court finds the categories listed in the warrants to be searched were not overbroad.  Defendants' motions to suppress on this basis are therefore denied.

### 3.    *Timely Review of Warrant Returns*

Defendants Lima and Battice move to suppress social media, iCloud, and cell phone information because the Government allegedly failed to complete its review of the seized data and provide warrant returns within a reasonable time.  Lima Mem. at 15-16; Battice Mem. at 19-23.

Federal Rule of Criminal Procedure 41 requires a warrant to command the executing officer to execute it within 14 days.  *United States v. Alston*, No. 15 CR. 435 (CM), 2016 WL 2609521, at *3 (S.D.N.Y. Apr. 29, 2016) (McMahon, J.) (citing Fed. R. Crim. P. 41(e)(2)(A)(i)).

With respect to electronically stored information, however, Rule 41 permits the Government to copy the information and review it at a later time consistent with the warrant.  Fed. R. Crim. P. 41(e)(2)(B) ("Unless otherwise specified, the warrant authorizes a later review of the media or information consistent with the warrant.  The time for executing the warrant in Rule 41(e)(2)(A) and (f)(1)(A) refers to the seizure or on-site copying of the media or information, and not to any later off-site copying or review."); *see id.,* 2009 Advisory Committee Notes ("This rule acknowledges the need for a two-step process: officers may seize or copy the entire storage medium and review it later to determine what electronically stored information falls within the scope of the warrant.").  "While Rule 41 prescribes no particular time period for data extraction in these circumstances, the time needed to complete off-site copying or review is subject to the rule of reasonableness."  *Alston,*  2016 WL 2609521, at *3.  The executing officer must then "promptly return [the warrant]—together with a copy of the inventory," which may be limited to describing the physical storage media that was seized or copied—"to the magistrate judge designated on the warrant."  Fed. R. Crim. P. 41(f)(1)(D) and (B).  The rule does not define how prompt the officer must be because "the practical reality is that there is no basis for a 'one size fits all' presumptive period" and "[a] substantial amount of time can be involved in the forensic imaging and review of information . . .  due to the sheer size of the storage capacity of media, difficulties created by encryption and booby traps, and the workload of the computer labs."  *Id*., 2009 Advisory Committee Notes.  Once the warrant is returned with a copy of the inventory, "[t]he judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant."  Fed. R. Crim. P. 41(f)(1)(D).

In the present case and as relevant to this claim, the Government issued the following warrants:

- A warrant to search Defendant Battice's Facebook accounts, dated June 22, 2021;

- A warrant to search Defendant Battice's iPhone, dated August 20, 2021;

- A warrant to search Defendant Battice's iCloud account, dated August 23, 2021;

- A warrant to search Defendant Lima's iCloud account, dated June 22, 2021;

- A warrant to search Defendant Lima's phone, dated June 22, 2021; and

- A warrant to search Defendant Lima's phone, dated August 9, 2021.

Battice Mem. at 18; Hueston Decl., Exs. D-F, ECF Nos. 200-3, 200-4, 200-5.  In discovery, the Government produced the following:

- A forensic image of Defendant Battice's cell phone on October 17, 2021;

- A forensic image of Defendant Battice's Facebook accounts on October 17, 2021;

- A forensic image of Defendant Battice's iCloud account on December 3, 2021;

- Telephone subscriber, call details, and cell site records associated with Defendant Lima on October 17, 2021;

- IMEI and iCloud data, including a Cellebrite report, associated with Defendant Lima on December 3, 2021;

- Additional iCloud data associated with Defendant Lima on April 26, 2022;

- The extractions taken from Defendant Battice's cell phone and social media accounts on May 4, 2022; and

- A Cellebrite report of iCloud data associated with Defendant Lima on May 27, 2022.

Battice Mem. at 19; Lima Mem. at 15-16.

According to Defendant Battice, defense counsel inquired about the Rule 41 returns on April 18, 2022.  Battice Mem. at 19.  On April 26, 2022, the Government produced the returns, which are dated April 22, 2022 and which indicate the warrants were executed on the same day they were issued.  *Id*.

Based on these dates, Defendants claim the Government took an unreasonable amount of time to review the seized material and submit warrant returns.  The Court disagrees.  First, the amount of time taken to review the seized materials was reasonable in light of the sheer volume of electronically stored records to review.  The Government has executed over 65 search warrants, with cell phone downloads regularly producing approximately 200 GB of data and over 20,000 photographs and videos each.  Gov't Mem. at 46-47.  Fed. R. Crim. P. 41 contemplates that the volume of electronic data collected will often take the Government substantial time to review.  *See* Fed. R. Crim. P. 41, 2009 Advisory Committee Notes.  Moreover, courts "have previously determined that delays of 10 months, or more, in reviewing electronic data are not *per se* unreasonable, even when the government does not furnish a basis for the delay in searching electronic data."  *United States v. Estime*, No. 19-CR-711 (NSR), 2020 WL 6075554, at *14 (S.D.N.Y. Oct. 14, 2020) (Roman, J.) (citing cases).

Second, while the Government may not "seize and image electronic data and then retain that data with no plans whatsoever to *begin* review of that data to determine whether any irrelevant, personal information was improperly seized," *United States v. Metter*, 860 F. Supp. 2d 205, 215 (E.D.N.Y. 2012) (Irizarry, J.) (emphasis in original), there is no indication that such a delay occurred here.  The Government made regular productions throughout its investigation beginning on October 17, 2021, only two and a half months after the Superseding Indictment was filed.  The Government has also submitted emails indicating its review of the seized material

30

continued as the search warrants were executed.  *See* Gov't Mem., Exs. 8-14.  Accordingly, the

Court finds the Government's review of seized materials occurred over a reasonable amount of

time.

Defendants also contend the warrant returns violated Rule 41 because they were not

timely filed.  Battice Mem. at 23.  "While the Second Circuit does not countenance lack of

compliance with the technical requirements of Rule 41, violations of Rule 41 alone should not

lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have

occurred or would not have been so abrasive if the Rule had been followed, or (2) there is

evidence of intentional and deliberate disregard of a provision in the Rule."  *United States v.*

*Bryant*, No. 19-CR-80-01 (NSR), 2020 WL 5659646, at *6 (S.D.N.Y. Sept. 23, 2020) (Roman,

J.) (citing *United States v. Allen*, 169 F. App'x 634, 636 (2d Cir. 2006) (summary order))

(internal quotations marks omitted).  Here, Defendants have offered no evidence indicating they

have suffered prejudice as a result of the alleged violation of Rule 41 or that the Government

violated Rule 41 intentionally or with deliberate disregard.

The Court therefore finds exclusion inappropriate on the basis of a Rule 41 violation, and

the motions to suppress on this basis are denied.

### C.    Defendant Lima's Motion to Compel the Production of 21-MC-2208

Defendant Lima moves for the Court to compel the Government to produce 21-MC-2208,

which authorized a pen register and trap and trace device on Defendant Lima's phone.  Lima

Mem. at 15.  Local Criminal Rule 16.1 requires Defendant to confer with the Government

regarding certain discovery issues prior to being raised to the Court.  E.D.N.Y. Local Crim. R.

16.1 ("No motion addressed to a bill of particulars or any discovery matter shall be heard unless

counsel for the moving party files in or simultaneously with the moving papers an affidavit

certifying that counsel has conferred with counsel for the opposing party in an effort in good faith to resolve by agreement the issues raised by the motion without the intervention of the Court and has been unable to reach agreement."). Before raising any issue with respect to 21-MC-2208, the parties are directed to comply with the Local Rules. The Government has indicated it is amendable to conferring with Defendant Lima on this issue. Accordingly, the motion to compel is denied without prejudice to refile.

### D. Defendant Lima's Motion to Suppress His Post-Arrest Statement

Defendant Lima also moves to suppress his August 10, 2021 post-arrest statement pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). After he was arrested, Defendant Lima "engage[d] with the agents in a manner where it could be construed that he is familiar with, or involved in, the indicted conduct." Lima Mem. at 3. The Government represents it does not intend to introduce Defendant Lima's August 10, 2021 post-arrest statement at its case-in-chief at trial. Gov't Mem. at 58. Accordingly, the Court denies the motion as moot. *See United States v. Hyman*, No. 18-CR-307 (BMC) (LB), 2019 WL 5696840, at *2 (E.D.N.Y. Nov. 4, 2019) (Cogan, J.) (denying motion to suppress statements when the government has indicated it does not intend to offer the statements in its case-in-chief); *United States v. Brown*, No. 18-CR-6119 CJS/MWP, 2020 WL 6778254, at *1 (W.D.N.Y. Nov. 18, 2020) (same); *United States v. Shaw*, No. 16-CR-642 (RJS), 2017 WL 1380598, at *3 (S.D.N.Y. Apr. 13, 2017) (Sullivan, J.) (same).

## II.     Motions to Sever

Federal Rule of Criminal Procedure 8 permits the Government to join multiple offenses in an indictment if the offenses "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R.

Crim. P. 8(a).  The indictment may join multiple defendants "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses."  Fed. R. Crim. P. 8(b).  In the federal system, "[t]here is a preference . . . for joint trials of defendants who are indicted together" because "joint trials promote efficiency and help avoid the problem of inconsistent verdicts."  *United States v. DiScala*, No. 14-CR-399 (ENV), 2018 WL 1187394, at *20 (E.D.N.Y. Mar. 6, 2018) (Vitaliano, J.) (citing *Zafiro v. United States*, 506 U.S. 534, 537 (1993)).

However, Federal Rule of Criminal Procedure 14(a) permits a trial court to sever defendants' trials or to "provide any other relief justice requires" if "the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant."  Fed. R. Crim. P. 14(a); *see United States v. Feyrer*, 333 F.3d 110, 114 (2d Cir. 2003).  Having a better chance of acquittal in a separate trial, by itself, does not entitle a defendant to severance.  *United States v. Schlegel*, 687 F. App'x 26, 27–28 (2d Cir. 2017) (summary order) (citing *Zafiro*, 506 U.S. at 540).  Rather, severance is appropriate "only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 539.  To succeed on a motion for severance, a defendant "must meet the heavy burden of showing that a joint trial would result in substantial prejudice amounting to a miscarriage of justice."  *United States v. Gallo*, 668 F. Supp. 736, 749 (E.D.N.Y. 1987) (Weinstein, C.J.) (internal citations and quotations omitted).  The risk of prejudice to a defendant is heightened "where evidence that would be inadmissible against a defendant is admitted against a co-defendant, or, when a case is complex, defendants with 'markedly different degrees of culpability' are tried."  *DiScala*, 2018 WL 1187394, at *20 (citing *Zafiro*, 506 U.S. at 539).

However, "just because evidence may only be admissible against one defendant, and not another, severance is not necessarily warranted." *Id.* (citing *United States v. Rittweger*, 524 F.3d 171, 179 (2d Cir. 2008)).  Indeed, "[e]ven in those circumstances where the risk of prejudice is high, less drastic measures—such as limiting instructions—often suffice to cure any risk of prejudice." *Schlegel*, 687 F. App'x at 28 (citing *Zafiro*, 506 U.S. at 539) (summary order).  The prejudice inquiry "is highly fact-specific and must be evaluated on a case-by-case basis." *United States v. Barret*, 824 F. Supp. 2d 419, 433 (E.D.N.Y. 2011) (Matsumoto, J.) (citing *Zafiro*, 506 U.S. at 539)).

The policy favoring joint trials is "particularly strong (and the basis for severance is particularly weak) where codefendants are alleged to have participated in a common plan or scheme." *United States v. Cooper*, No. 17-CR-296 (PKC), 2020 WL 2307646, at *8 (E.D.N.Y. May 8, 2020) (Chen, J.) (internal quotations and citations omitted); *see also United States v. Cardascia*, 951 F.2d 474, 482 (2d Cir. 1991) (finding deference to trial courts' severance decisions especially strong "when the underlying crime involves a common plan or scheme and defendants have been jointly indicted"); *see also United States v. Salameh*, 152 F.3d 88, 115 (2d Cir. 1998).  Specifically, in cases brought under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), "the claim that separate trials would eliminate the so-called spillover prejudice is at least overstated if not entirely meritless." *DiNome*, 954 F.2d at 843.  In such cases the Government must prove an enterprise and a pattern of racketeering activity, which "may well entail evidence of numerous criminal acts by a variety of persons," some of whom "may reasonably claim no direct participation in some of those acts." *Id.* (citing 18 U.S.C. § 1962(c)).  "Nevertheless, evidence of those acts is relevant to the RICO charges against each defendant." *Id.*; *accord United States v. James*, 712 F.3d 79, 104 (2d Cir. 2013).

**A.      Motions for Severance Based on "Spillover" Prejudice**

Defendant Battice moves for severance pursuant to Federal Rule Criminal Procedure 14,

claiming he will face "prejudicial spillover" if the Court does not sever his trial, especially

because the jury will infer his guilt based on the acts of his co-Defendants and because he is one

of only two Defendants not alleged to be members of the Folk Nation Gangster Disciples.

Battice Mem. at 25.  Similarly, Defendant Lima claims severance is required because he "will be

adversely affected by spillover prejudice from the separately charged counts," particularly

because he is also not alleged to be a member of GD.  Lima Mem. at 8.  Defendant Hepburn

argues he will be prejudiced at a joint trial because "the government is expected to adduce

significant evidence of multiple crimes, much of which is not admissible against" him.  Hepburn

Mem. at 2.  Finally, Defendant Brown moves for severance on the grounds that he is the only

defendant not charged with attempted murder or conspiracy to commit murder.  Brown Mem. at

2, ECF No. 201-1.  As a result, Brown argues, the Government's evidence of those crimes will

"have a substantial impact on the jury's ability to weigh [his] guilt or innocence without

prejudice."  *Id*.

*1.      Common Plan or Scheme*

Defendants have not presented evidence of "substantial prejudice" justifying severance.

Although Defendants claim they would be prejudiced by evidence admissible against co-

Defendants but not against them individually, much of any such evidence would be admissible

against each Defendant even at a severed trial.  A joint trial results in prejudice "when proof

inadmissible against a defendant becomes a part of his trial solely due to the presence of co-

defendants as to whom its admission is proper."  *Salameh*, 152 F.3d at 115.  However, "the fact

that evidence may be admissible against one defendant but not another does not necessarily

require a severance." *Rittweger*, 524 F.3d at 179 (citing *United States v. Carson*, 702 F.2d 351, 367 (2d Cir. 1983)).  In the RICO context, evidence of criminal acts related to the alleged enterprise and pattern of racketeering activity may be admissible against other defendants without resulting in prejudice.  *See DiNome*, 954 F.2d at 843.   RICO expanded the "scope of authority for joining defendants who are alleged to have participated in a common grouping or association," because "the RICO conspiracy charge . . . supplies the sufficient nexus to tie the various defendants and the diverse predicate offenses together."  *Gallo*, 668 F. Supp. at 747 (citation and internal quotation marks omitted).  Therefore, particularly "[w]here the alleged RICO enterprise involves underlying crimes of a similar nature, courts in this circuit have found insufficient prejudice to grant severance, even with respect to defendants not charged in the alleged overarching RICO enterprise."  *United States v. Webb*, No. 15-CR-252 (S-3) (PKC), 2020 WL 6393012, at *7 (E.D.N.Y. Nov. 1, 2020) (Chen, J.) (citing cases).

Here, the Superseding Indictment charges each Defendant with committing crimes in aid of racketeering under 18 U.S.C. § 1959.  These crimes were part of an alleged common scheme or plan involving the commission of violence, including targeted shootings of rival gang members, as a requirement of membership in or association with GD and as a means to further the enterprise.  Accordingly, evidence of the enterprise, its composition, goals, and its involvement in racketeering activity would likely be admissible against each Defendant regardless of whether the Court granted separate trials.  More specifically, evidence of the alleged crimes of each Defendant would likely be admissible against his co-Defendants at severed trials.  *See Cooper*, 2020 WL 2307646, at *7–8  (finding no risk of spillover prejudice because counts charging predicate acts in support of RICO conspiracy would still be admissible at separate trial); *United States v. Hawit*, No. 15-CR-252 (PKC), 2017 WL 2271352, at *4

(E.D.N.Y. May 22, 2017) (Chen, J.) (finding defendant charged only with RICO conspiracy not entitled to severance in part because evidence of other criminal schemes would be admissible in a separate trial as proof of the existence of the RICO conspiracy). Therefore, the risk of potential "spillover" prejudice from the evidence against co-Defendants is insufficient to justify severance.

2.    *Levels of Participation*

Defendants also claim that differences in their levels of participation in the common plan or scheme give rise to potential prejudice at a joint trial. Specifically, Defendants Battice and Lima claim their roles as alleged "associates" in the GD—as opposed to "members"—justify separate trials. Although Defendants Battice and Lima are alleged to be "associates" of GD, the Superseding Indictment alleges that "[m]embers *and associates* of GD [(1)] have committed acts of violence, including acts involving murder and assault, as well as other crimes, including robbery, extortion, trafficking in counterfeit currency, drug trafficking, fraud and obstruction of justice"; (2) "constituted an 'enterprise'" and (3) "engaged in racketeering activity." Superseding Indictment ¶¶ 3-5 (emphasis added). Moreover, "[d]iffering levels of culpability and proof are inevitable in any multi-defendant trial and, standing alone, are insufficient grounds for separate trials." *United States v. Spinelli,* 352 F.3d 48, 55 (2d Cir. 2003) (quoting *Carson*, 702 F.2d at 366–67). Moreover, Defendants' alleged positions in GD do not affect the admissibility of evidence against them. Whether Defendants Battice and Lima were associates or members of GD is, without more, insufficient to find prejudice justifying separate trials. *See United States v. Locascio*, 6 F.3d 924, 947 (2d Cir. 1993) ("[J]oint trials involving defendants who are only marginally involved alongside those heavily involved are constitutionally permissible.").

### 3.     *Amount of Type of Evidence Involved*

Defendants next claim differences in the amount or type of evidence to be offered against them justifies severance.  However, the Court finds the evidence likely to be introduced against each Defendant is in fact similar in nature.  The alleged shootings, with the exception of the Gold Room shooting, follow similar patterns involving the use of convoys with decoy cars to commit drive-by shootings of groups of people in rival gang territory.  Moreover, the charges against the Defendants moving to sever are nearly identical to the charges against their co-Defendants.

For example, Defendant Battice, an alleged associate of GD, is charged with Conspiracy to Murder Rival Gang Members, two counts of Attempted Murder In-Aid-Of Racketeering, Attempted Assault In-Aid-Of Racketeering, Assault In-Aid-Of Racketeering, and Possessing, Brandishing and Discharging a Firearm During a Crime of Violence in connection with the November 7, 2020 shootings.  Superseding Indictment at 9-13.  Defendant Lima, an alleged associate of GD, is charged with Conspiracy to Murder Rival Gang Members, Attempted Murder In-Aid-Of Racketeering, Assault In-Aid-Of Racketeering, and Possessing, Brandishing and Discharging a Firearm During a Crime of Violence in connection with the second November 9, 2020 shooting.  *Id.* at 9-10, 14-15.  Defendant Hepburn, an alleged member of GD, is charged with Conspiracy to Murder Rival Gang Members, two counts of Attempted Murder In-Aid-Of Racketeering, Attempted Assault In-Aid-Of Racketeering, Assault In-Aid-Of Racketeering, and Possessing, Brandishing and Discharging a Firearm During a Crime of Violence in connection with the November 9, 2020 shootings.  *Id.* at 9-10, 13-16.  The overlap among these charges, the statutes that were allegedly violated, and the underlying facts of the alleged shootings all weigh against a finding that Defendants would be prejudiced at a joint trial.

In support of their motions for severance, Defendants Lima and Brown cite to *Gallo*, 668 F. Supp. 736, which involved a twenty-two count, multi-defendant RICO indictment.  There, some defendants were leaders of the Gambino crime family charged with murders, robberies, and extortions, while others were not members of the Mafia and were charged only with Taft–Hartley violations and obstruction of justice.  In light of these differences, the court severed the latter defendants.  *Gallo*, however, is readily distinguishable from the present case.  In contrast to *Gallo*, the charges against Defendants in this case have similar factual and statutory bases and involve similar levels of violence such that any prejudice is minimal.

Only Defendant Brown faces charges that are slightly different in nature than those faced by his co-Defendants.  Defendant Brown, an alleged member of GD, is charged with Assault In-Aid-Of Racketeering, being a Felon in Possession of a Firearm, and Possessing, Brandishing and Discharging a Firearm During a Crime of Violence.  Superseding Indictment at 5-6.  These charges arise from Defendant Brown's alleged role in the March 14, 2020 Gold Room shooting.  Unlike his co-Defendants, Defendant Brown is not charged with attempted murder or conspiracy to commit murder.  Moreover, the shooting in which he was allegedly involved does not follow the same factual pattern as those allegedly committed by his co-Defendants, particularly because it was not a drive-by shooting.  Defendant Brown characterizes these distinctions as "markedly different," citing *United States v. Maisonet*, No. S3 97 CR. 0817 (DC), 1998 WL 355414, at *7 (S.D.N.Y. July 1, 1998) (Chin, J.).

However, the crimes charged against Defendant Brown are not, in fact, "markedly different" than those charged against his co-Defendants.  Like many of his co-Defendants, Defendant Brown is an alleged member of GD charged with Assault In-Aid-Of Racketeering and Possessing, Brandishing and Discharging a Firearm During a Crime of Violence—in addition to

39

being a Felon in Possession of a Firearm—in connection with a shooting the Government claims was instigated by perceived disrespect to GD.  In *Maisonet*, by contrast, the court found severance appropriate for a defendant charged with obstructing justice when his co-defendants were charged with murder, attempted murder, the use of firearms, narcotics violations, and witness tampering.  There is no such disparity in the severity of the charges in the present case.  Accordingly, there is insufficient evidence to show Defendant Brown would face prejudice in this regard.

Moreover, as with his co-Defendants, evidence of crimes committed in furtherance of the enterprise—even those Defendant Brown is not alleged to have committed—would likely be admissible even at a severed trial.  Defendant Brown objects, arguing that while a RICO charge allows the Government to introduce evidence of criminal activities in which a defendant did not participate to prove the enterprise element, any such evidence should still be excluded under Fed. R. Evid. 403.  Rule 403 permits a court to exclude evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  Fed. R. Evid. 403.  Defendant Brown claims the probative value of the evidence supporting the enterprise element is substantially outweighed by unfair prejudice and needlessly cumulative evidence.  Brown Mem. at 4.  However, evidence of the shootings, including video evidence, is extremely probative of the existence of the GD enterprise, the means and methods employed by the enterprise, and the alleged racketeering activity of the enterprise, and such evidence would likely be necessary to establish the enterprise element.  Because the Government will need to prove that element with respect to Defendant Brown, whether or not his trial is severed, the risk of unfair prejudice and needlessly cumulative evidence does not

"substantially outweigh" the probative value of this evidence.  Severance is thus unwarranted on this basis.

### 4.  Jury's Capacity to Consider Evidence

In determining whether a defendant would be prejudiced by a joint trial, the Court must also consider whether the evidence against Defendant is "sufficiently straightforward" so that a jury "could consider it without any significant spillover effect" and whether the Court can give limiting instructions "explaining when evidence could not be considered against a particular defendant" and a jury charge explaining that "jurors must consider the case against each defendant separately."  *Rittweger*, 524 F.3d at 179 (citing *Carson*, 702 F.2d at 367 and *Zafiro*, 506 U.S. at 539–40).

Even in complex RICO cases, "[t]here is no support in caselaw or in logic for the proposition that a lengthy trial, a large number and variety of charges, and numerous defendants violate due process without a showing that the issues were actually beyond the jury's competence."  *DiNome*, 954 F.2d at 842 (noting the evidence presented could be "understood without difficulty" because although the crimes charged were "large in number and variety," they were "rather ordinary in nature" and "the alleged complexity stemm[ed] more from the abundance of evidence than from the subtlety of the analysis needed to consider it"); *see also Hawit*, 2017 WL 2271352, at *8  ("[J]uries are routinely required to sort out this type of disparate evidence relating to different crimes committed by different members of a criminal organization.").

The evidence in this case, while voluminous, is sufficiently straightforward for a jury to evaluate properly without any significant spillover effect.  The crimes charged in the present case are "rather ordinary in nature" and are "not extraordinarily difficult to comprehend, as they

might be, for example, in a complex antitrust case involving abstruse economic theories or an employment discrimination case involving technical statistical evidence and formulae." *DiNome*, 954 F.2d at 842-43 (quoting *United States v. Casamento*, 887 F.2d 1141, 1150 (2d Cir. 1989). At most, the trial will have nine defendants and last six weeks. *See* Aug. 12, 2022 Order, ECF No. 256. There is no reason to believe a jury would not be able to compartmentalize and weigh the evidence against each Defendant fairly. *See United States v. Garcia*, 848 F.2d 1324, 1334 (2d Cir. 1988) ("the relatively small number of defendants, the straightforward nature of the proof, the similarity of the charged offenses, and the short trial all support the trial court's determination that the jury was able fairly to weigh the evidence against each defendant."), *rev'd on other grounds,* 490 U.S. 858 (1989).

To the extent some of the evidence is admissible against certain Defendants and not others, the Court can give limiting instructions "explaining when evidence could not be considered against a particular defendant" and a jury charge explaining that "jurors must consider the case against each defendant separately." *Rittweger*, 524 F.3d at 179; *see also Barret*, 824 F. Supp. 2d at 436 (citing *Spinelli*, 352 F.3d at 55) ("[I]n lieu of severance, a trial court may elect in its discretion to instruct jurors to consider each defendant individually to diminish the prejudice that may result in a joint trial in which the volume or weight of evidence is greater as to some defendants than others."); *see also United States v. Giovanelli*, 747 F. Supp. 875, 887 (S.D.N.Y. 1989) (Motley, J.) ("[S]uch admonitory instructions will cure any prejudice to [defendant], or any of his co-defendants, that might result from evidence offered against some co-defendants but not others."); *see also United States v. Souza*, No. 06-CR-806 (SLT), 2008 WL 753736, at *8 (E.D.N.Y. Mar. 19, 2008) (Townes, J.) ("[M]uch potential prejudice can be remedied through the use of limiting jury instructions, instructing the jury to consider each

defendant individually.") (citing *Spinelli*, 352 F.3d at 55).  Thus, any prejudice stemming from the introduction of evidence irrelevant to Defendant Battice can be cured through limiting instructions.

In furtherance of his motion for severance, Defendant Battice adds that his trial should be severed because the Government has failed to provide "an especially compelling justification" for a joint trial.  Battice Mem. at 25 (citing *Casamento*, 887 F.2d at 1152).  However, such a justification is required in a "trial in which the prosecution's case is likely to require more than four months to present."  *Casamento*, 887 F.2d at 1152.  As discussed, this trial is expected to last, at most, six weeks.  Therefore, the Government is not obligated to demonstrate "an especially compelling justification" for a joint trial.  *Id.*

### 5.    *Judicial Efficiency*

Finally, the arguments for severance do not outweigh the Court's interest in "promoting efficiency, avoiding inconsistent verdicts, minimizing inconvenience to witnesses, preserving judicial resources, and avoiding delays."  *United States v. Liburd*, No. 17-CR-296 (PKC), 2019 WL 319392, at *7 (E.D.N.Y. Jan. 24, 2019) (Chen, J.) (citing *Zafiro*, 506 U.S. at 537).  Indeed, the general rule favoring joint trials is "designed to conserve judicial resources, alleviate the burdens on citizens serving as jurors, and avoid the necessity of having witnesses reiterate testimony in a series of trials."  *Gallo*, 668 F. Supp. at 748 (internal marks omitted) (citing *United States v. Borelli,* 435 F.2d 500, 502 (2d Cir. 1970)).  These interests are especially strong in the RICO context, where requiring "the government to divide its evidence of the RICO counts and parse it . . . would place an unnecessary burden on the government to divide up its case."  *Cooper*, 2020 WL 2307646, at *7–8 (citing *United States v. Locascio*, 357 F. Supp. 2d 536, 546 (E.D.N.Y. 2004)).

Severance in the present case would diminish the efficiency of the Court, unnecessarily expend judicial resources, cause delays, and inconvenience witnesses and victims, who may have to relive and testify to traumatic experiences at multiple trials.  Individual trials would be lengthy, requiring the introduction of extensive—and duplicative—evidence, including surveillance videos, phone records, witness statements, social media records, and more.  The benefits of severance do not outweigh the Court's interest in efficiency, and severance is therefore unwarranted.

### B.    *Bruton* Claims for Severance

Defendants Hepburn and Lima move for severance pursuant to *Bruton v. United States*, 391 U.S. 123 (1968) and *Crawford v. Washington*, 541 U.S. 64 (2004).  Hepburn Mem. at 1; Lima Mem. at 1.  Defendant Hepburn argues severance is warranted "[i]f the government intends to use" "statements of co-defendants as part of its proof in the case."  Hepburn Mem. at 2. Defendant Lima adds that severance is proper under this line of cases based on potential antagonistic defenses.  Lima Mem. at 6.

In *Bruton,* the Supreme Court held that "where two defendants are tried jointly, the admission into trial evidence of a nontestifying co-defendant's extrajudicial statements, which are incriminating on their face and implicate the defendant, impermissibly violates defendant's constitutional right of confrontation and cross-examination of witnesses under the Confrontation Clause of the Constitution, even if the jury is instructed to consider that statement only against the declarant."  *United States v. Pimentel*, No. 99-CR-1104 (SJ), 2001 WL 185053, at *3 (E.D.N.Y. Jan. 22, 2001) (Johnson, J.) (citing *Bruton v. United States,* 391 U.S. 123, 136–37 (1968)).

44

However, in the present case, the Government represents it does not intend to introduce any testimonial statements by co-Defendants who will not appear as witnesses at trial.  Gov't Mem. at 57.  Accordingly, the motions to sever under *Bruton* are denied as moot.  *See United States v. Dacunto*, No. 00 CR. 620 (AGS), 2001 WL 13343, at *9 (S.D.N.Y. Jan. 5, 2001) (Schwartz, J.) (denying motion under *Bruton* because the Government represented it was not aware of any co-defendant statements implicating *Bruton*); *see also United States v. Abrams*, 539 F. Supp. 378, 382–83 (S.D.N.Y. 1982) (Stewart, J.) (denying motion for severance in part because even if a potentially offending statement was admissible, "the government may choose to forego its use to avoid the need for severance") (*citing United States v. Figueroa*, 618 F.2d 934, 944 (2d Cir. 1980)).

Defendant Lima's claim for severance on the basis of antagonistic defenses is also unavailing.  "To obtain a severance on the ground of antagonistic defenses, a defendant must show that the conflict is so irreconcilable that acceptance of one defendant's defense requires that the testimony offered on behalf of a codefendant be disbelieved." *United States v. Tutino*, 883 F.2d 1125, 1130 (2d Cir. 1989) (citing *United States v. Potamitis*, 739 F.2d 784, 790 (2d Cir. 1984)).  However, "even mutually exclusive antagonistic defenses, in which the jury *must necessarily* disbelieve one defendant's story in order to believe another, do not require severance as a 'bright line rule.'" *United States v. Chierchio*, No. 20-CR-306 (NGG), 2022 WL 523603, at *5 (E.D.N.Y. Feb. 22, 2022) (Garaufis, J.) (emphasis in original) (citing *Zafiro*, 506 U.S. at 538). Moreover, a showing of antagonistic defenses requires the defendant to "make a factual demonstration that 'acceptance of one party's defense would tend to preclude the acquittal of [the] other.'" *United States v. Lauria*, No. 19-CR-449-01 (NSR), 2020 WL 5743523, at *14 (S.D.N.Y. Sept. 25, 2020) (Roman, J.) (quoting *Salameh*, 152 F.3d at 116).  Defendant Lima has

made no such factual demonstration in this case.  His motion for severance on this basis is thus denied.

### C.        Potential Logistical Issues Do Not Justify Severance.

Defendant Battice also moves for severance pursuant to Federal Rule Criminal Procedure 14 on the ground that a trial of eleven defendants (now nine) is too large, too unwieldy, too taxing on jurors, and too difficult for the United States Marshals Service to accommodate, citing *Casamento*, 887 F.2d at 1152.  Battice Mem. at 25.

With respect to Defendant Battice's logistical concerns, the United States District Court for the Eastern District of New York and the United States Marshals Service are more than capable of managing the trial of the nine Defendants who have yet to resolve their cases.  The Court also shares Defendant's concern for conserving the time of individual jurors.  In large multi-defendant cases lasting many months, it may "indeed become difficult to coordinate the schedules of witnesses, jurors, and lawyers alike."  *United States v. Victor Teicher & Co., L.P.*, 726 F. Supp. 1424, 1439 (S.D.N.Y. 1989) (Haight, J.) (citing *Gallo*, 668 F. Supp. at 754).

However, Defendant Battice's comparison to *Casamento* is inapposite.  The Second Circuit in *Casamento* raised a concern for individual jurors' time in the context of a seventeen-month trial, urging courts to consider the issue in trials with more than ten defendants that are expected to last more than four months.  *Casamento*, 887 F.2d at 1152.  This trial will have no more than nine defendants and last no more than six weeks.  Accordingly, the Court is satisfied that individual juror time will be appropriately conserved.

For the foregoing reasons, Defendants' motions to sever are denied.

### III.    Other Motions

**A.      Defendant Bailey's Motion for an Order to Retain and Preserve Notes**

Defendant Bailey moves for the Court to order the Government "to retain and preserve all notes made by federal, state, and local agents and investigative personnel involved in any aspect of this case, made during the course of the investigation."  Bailey Mem. at 22.  Defendant Bailey argues these notes may contain material to which he is entitled under Fed. R. Crim P. 16(a), 18 U.S.C. § 3500, this Court's Standing Order on Discovery, *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States,* 405 U.S. 150 (1972).  *Id*.  Courts in this Circuit regularly deny motions to preserve investigative notes as moot when the Government acknowledges its obligation to preserve notes and states it will instruct agents to preserve such notes.  *See, e.g., United States v. McKenzie*, No. 1:14-CR-169 (MAD), 2015 WL 13840885, at *21 (N.D.N.Y. Nov. 4, 2015), *aff'd,* 13 F.4th 223 (2d Cir. 2021) (denying motion for the preservation of investigative notes without prejudice in light of Government's acknowledgment of its obligations); *see also United States v. Angulo-Aguirre*, No. S4 07-CR-387 (CM), 2008 WL 11345907, at *6 (S.D.N.Y. Mar. 14, 2008) (McMahon, J.) (declining to act on a motion to order the preservation of notes in light of Government representations it is aware of its obligation to preserve discoverable evidence and to produce notes); *see also United States v. Santoro*, No. 03-CR-484 (TPG), 2004 WL 2346621, at *3 (S.D.N.Y. Oct. 19, 2004) (Griesa, J.) (dismissing motion compelling preservation of notes as moot where Government promised to preserve notes).

Here, the Government states it understands its discovery obligations and will advise its investigative agents to appropriately preserve their notes so they may be disclosed as appropriate. The Court therefore denies the motion as moot at this time.

**B.      Defendant Bailey's Motion for Disclosure of Rule 404(b) Evidence**

Defendant Bailey moves for the Court to compel the Government to disclose, prior to trial, all evidence it intends to offer pursuant to Rule 404(b) of the Federal Rules of Evidence. Bailey Mot. at 23.  Under Rule 404(b), while evidence of other crimes, wrongs, or acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(1)-(2).  If the Government intends to offer such evidence at trial, it must provide "reasonable notice" to the defendant.  Fed. R. Evid. 404(b)(3)(A).  Defendant Bailey requests any such notice be provided "no later than thirty days after the resolution of this motion."  Bailey Mot. at 23.  In response, the Government states it is aware of and will comply with Rule 404(b)'s reasonable notice requirement.  Moreover, the Government requests permission to provide notice of Rule 404(b) evidence on the day motions in limine are due—in this case, the motions are to be fully briefed by September 30, 2022— accompanied by briefing explaining why the Government believes such evidence is admissible.

Although Rule 404(b) does not define "reasonable notice," "[c]ourts in this Circuit have held that two or three weeks notice is reasonable[, and] a longer period may be appropriate, depending on the circumstances." *United States v. Vaid*, No. 16-CR-763 (LGS), 2017 WL 3891695, at *13 (S.D.N.Y. Sept. 5, 2017) (Schofield, J.) (citing *United States v. Rivera*, No. 16-CR-175 (LGS), 2017 WL 1843302, at *1 (S.D.N.Y. May 8, 2017) (Schofield, J.) (internal quotation marks omitted)); *accord United States v. Bonventre*, No. 10-CR-228 (LTS), 2013 WL 2303726, at *9 (S.D.N.Y. May 28, 2013) (Swain, J.).

Defendant Bailey has not raised any circumstances justifying a thirty-day notice period. The Government has proposed a notice deadline of September 30, 2022—seventeen days before

48

the start of trial and within the timeframe courts in this Circuit have found to be reasonable. Accordingly, the Court directs the Government to provide notice of any Rule 404(b) evidence it intends to use at trial by September 30, 2022.

### C.     Defendant Bailey's Motions for Disclosure of Evidence Obtained Pursuant to State Action and the Government's Trial Exhibits

Defendant Bailey moves pursuant to Fed. R. Crim. P. 16, the Fourth and Fifth Amendments to the United States Constitution, and *Elkins v. United States*, 364 U.S. 206 (1960) for the Court to order the Government "to disclose any and all evidence or information seized or obtained by state law enforcement agents, whether or not acting in conjunction with the United States." Bailey Mot. at 24.  In response, the Government states it "understand its obligations and will continue to abide by them, and that it will disclose (or has disclosed) this information to the extent it is in the government's possession and is discoverable pursuant to Rule 16 or any other discovery obligation." Gov't Resp. at 60.  The Court reminds the Government of its discovery obligations, including those arising under Rules 16 and 26.2, 18 U.S.C. § 3500, *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).  However, in light of the Government's representations to the Court, an order directing additional discovery is unnecessary at this time.  Accordingly, the Court denies the motion.

Defendant Bailey also moves for an order directing the Government "to provide formal written notice concerning the specific evidence it intends to use in its case-in-chief at trial" and for leave to file suppression motions after disclosure.  Bailey Mot. at 25.  The Government asserts it "will comply with whatever schedule the Court sets for disclosure of trial exhibits and requests only that the Court set a schedule that is consistent with its usual practice or is otherwise

reasonable under the circumstances." Gov't Resp. at 60.  The Court has ordered proposed trial exhibits, witness lists, and 18 U.S.C. § 3500 and *Giglio* material to be exchanged by October 3, 2022 at 5:00 P.M.  ECF No. 266.  Accordingly, the requested relief is not appropriate at this time and the motion is denied.

### D.      Defendant Lawrence's Motions.

On June 15, 2022, Defendant Lawrence pleaded guilty to Count Nine of the Superseding Indictment.  *See* June 15, 2022 Minute Entry.  Accordingly, Defendants motions at ECF No. 204 are denied as moot.

## CONCLUSION

For the foregoing reasons, Defendants' motions to sever, suppress, and grant various forms of relief prior to trial are denied.  The Clerk of Court is respectfully directed to terminate the motions pending at ECF Nos. 196, 199, 201, 202, 204, 207, 209, 218, and 239.

**SO ORDERED.**

**s/ WFK**

_____
HON. WILLIAM F. KUNTZ, II
UNITED STATES DISTRICT JUDGE

Dated: September 14, 2022
       Brooklyn, New York